UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MAXIIMUS PAYNE,

                  Plaintiff,

        - against -

NEW YORK CITY POLICE DEPARTMENT,
CITY OF NEW YORK,

                  Defendants.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
08-CV-03993 (RRM)(RLM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Maxiimus Payne ("plaintiff") brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law, N.Y. Exec. Law §§ 296 *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8–107 *et seq.* ("NYCHRL"), and New York state common law, asserting claims for employment discrimination, hostile work environment, and intentional infliction of emotional distress against defendants the New York Police Department ("NYPD") and the City of New York (together, "defendants"). Plaintiff Maxiimus Payne, who self-identifies as an African-American man and a member of the Rastafarian religion, worked as a probationary police officer for the NYPD from July 11, 2005 until his termination on August 27, 2007. (Def. 56.1 Stmt. ¶¶ 1, 124; Pl. 56.1 Stmt. ¶¶ 2, 77.) The NYPD attributes his termination to his performance as demonstrated by performance evaluations and records of disciplinary action. (Def. Mem. of Law.) Plaintiff alleges that actions taken against him were motivated by discriminatory intent based on his race, religion, and ethnicity. (Compl. ¶¶ 14, 16, 22; Pl. Mem. of Law; Pl. 56.1 Stmt. ¶ 3.) On February 7, 2011,

defendants moved for summary judgment on all claims.  For the reasons set forth below,

defendants' motion is GRANTED in part and DENIED in part.

**I.**
**BACKGROUND**[1]

**A.  Plaintiff's Employment History**

    **1.  The Police Academy**

        **a.  Employment**

Plaintiff was appointed a probationary police officer of the New York Police Department

("NYPD") and started at the Police Academy ("Academy") on July 11, 2005.  (Def. 56.1 Stmt.

¶¶ 1, 5; Pl. 56.1 Stmt. ¶¶ 2, 6.)  Around that time, plaintiff converted from Christianity to the

Rastafarian religion and started wearing his hair in dreadlocks as part of his religion.  (Def. 56.1

Stmt. ¶¶ 4, 12; Pl. 56.1 Stmt. ¶ 4; Deposition of Maxiimus Payne ("Pl. Dep."), at 31.)  Plaintiff's

supervisor at the Academy, Detective Tara Comiskey, appointed plaintiff to Company Sergeant

due to plaintiff's military background, a position responsible for helping instructors keep the

platoon in order.  (Def. 56.1 Stmt. ¶ 6–7; Pl. 56.1 Stmt. ¶¶ 7–9.)  Plaintiff was Company

Sergeant for a few weeks before being removed from the position after questioning a gym

---

[1] The following material facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with defendant's motion for summary judgment and plaintiff's opposition thereto. The facts are undisputed except as noted. The Local Rule 56.1 statement submitted by plaintiff (Doc. No. 48) failed to comply with the Local Rule.  Ordinarily, this failure would result in the material facts in defendant's statement being deemed admitted for the purposes of deciding the pending summary judgment motion.  *See* Local Civil Rule 56.1(c).  A district court, however, "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Rateau v. City of New York*, No. 06-CV-4751 (KAM)(CLP), 2009 U.S. Dist. LEXIS 90112, at *2 n.1 (E.D.N.Y. Sept. 29, 2009) (exercising the court's discretion to review the admissible record evidence in determining whether proposed undisputed facts were disputed).  Accordingly, for the purposes of this motion, defendant's statement of undisputed facts is treated as undisputed only where it is not controverted by admissible evidence in the record.

instructor's order that the recruits run long distances in extreme heat.  (Def. 56.1 Stmt. ¶ 8; Pl. 56.1 Stmt. ¶ 11; Pl. Dep. at 35–39.)

By September 6, 2005, plaintiff had received three Deportment Cards, which are notations for minor rules violations.  (Pl. 56.1 Stmt. ¶¶ 16, 30; Pl. 56.1 Stmt. ¶ 17, 19.)   On that same date, plaintiff's squad commander, Lieutenant Herman Cruz, wrote a memorandum indicating plaintiff was anticipated to require entry-level monitoring, despite that he "hasn't accumulated a large amount of deportment cards," because there were complaints from other recruits that he was a "bully."  (Def. 56.1 Stmt. ¶¶ 16–18; Pl. 56.1 Stmt. ¶ 23; Sept. 6, 2005 Cruz Memorandum, Switzer Dec'l Ex. D.)  Despite that plaintiff "did well in [his] tests," he was referred for a psychological evaluation based on the "bullying" complaints from his peers.  (Sept. 14, 2005 Referral for Psychological Evaluation, Switzer Dec'l Ex. H.)  The conclusions of the evaluation included that plaintiff's "[d]isciplinary issues are being handled as such, since they are not indicative of psychopathology" and "[a]s for the perception of him being intimidating and 'a bully,' there are no reports of his having any physical disputes or even threatening physical harm to anyone."  (Sept. 19, 2005 Closing Summary of Psychological Evaluation; Switzer Dec'l Ex. I.)

While at the Academy, plaintiff accumulated a total of twelve Deportment Cards.[2]  (Def. 56.1 Stmt. ¶ 36; May 2, 2006 Memorandum of Lt. Loos, Switzer Dec'l Ex. E.)  Officers can be issued Command Disciplines ("CDs") for more significant misconduct.  (Pl. 56.1 Stmt. ¶ 19.)  While at the Academy, plaintiff received three CDs: one for leaving a classroom without permission and lying to an instructor when questioned, and two based on his accumulation of Deportment Cards.  (Def. 56.1 Stmt. ¶¶ 19–20, 28–34; Reports of Violation of Rules, Switzer

---

[2] Plaintiff received Deportment Cards for violations such as losing his water bottle, not properly filling out a Department Card, and being unshaven.  (Def. 56.1 Stmt. ¶ 36; Pl. 56.1 Stmt. ¶ 27.)

Dec'l Exs. G, J, K.)  Plaintiff claims he did not formally challenge the CDs because he believed doing so may result in dismissal.  (Pl. 56.1 Stmt. ¶ 20; Pl. Dep. at 50, 59.)

On a performance evaluation dated November 16, 2005, which contains a number of checkboxes and space for comments, Detective Comiskey rated plaintiff as "Competent" overall and in all categories, except "Self-Discipline," which she rated "Low."  (Def. 56.1 Stmt. ¶ 37–43; Nov. 16, 2005 Comiskey/Mortis Evaluation, Switzer Dec'l Ex. L.)  Detective Comiskey wrote that plaintiff "met the requirements," "carried [him]self in a professional manner," and "met the physical standards."  Comiskey's overall comments were that "[plaintiff] had difficulty conforming to paramilitary standards in the beginning of the [A]cademy.  [Plaintiff] since has changed his demeanor and conformed to the [Academy's] standards."  (*Id.*)  The reviewer, Sergeant Pamela Mortis, also noted that plaintiff had "made positive changes in his behavior" and "established a better rapport with his peers."  The evaluation also contained a recommendation that his performance be monitored.  (*Id.*)

On November 17, 2005, an evaluation Committee discussed plaintiff's performance and also recommended monitoring based on plaintiff's "disciplinary record" and the recommendation of Detective Comiskey and plaintiff's "Team Leader."  (Def. 56.1 Stmt. ¶ 44; May 2, 2006 Memorandum of Lt. Loos ¶ 5; Pl. 56.1 Stmt. ¶ 35.)  The memorandum of the Committee discussed complaints from other recruits, plaintiff's Deportment Cards and CDs, and the November 16 evaluation.  (May 2, 2006 Memorandum of Lt. Loos.)  The recommendation was endorsed by the Commanding Officer of the Academy.  (Def. 56.1 Stmt. ¶ 44; Pl. 56.1 Stmt. ¶ 35; First Endorsement, Switzer Dec'l Ex. E.)  As part of the monitoring, performance evaluations were scheduled for the 10-month, 16-month, and 22-month anniversaries of his employment.

4

(Pl. 56.1 Stmt. ¶ 36; May 25, 2006 Memorandum of Deputy Inspector Donna Jones to the 70th
Precinct, Burden Dec'l Ex. K.)

### b. Alleged Discriminatory Treatment

Plaintiff testified that at the Academy, while he was Company Sergeant, Detective
Comiskey approached him and suggested he cut his hair.  (Def. 56.1 Stmt. ¶ 11; Pl. 56.1 Stmt. ¶
11.)  Plaintiff testified that he replied that his hairstyle was a ritual of his religion.  (Pl. Dep. at
41.)  Plaintiff testified that another instructor also said that plaintiff was "going to have a lot of
problems" and that he should cut his hair.  (Def. 56.1 Stmt. ¶¶ 13–15; Pl. Dep. at 61–64.)  He
also testified that other NYPD employees at the Academy also commented on plaintiff's
hairstyle and suggested that he cut his hair.  (Def. 56.1 Stmt. ¶¶ 13–15; Pl. Dep. at 61–64.)

### 2. The 70th Precinct

### a. Employment

In or around January 2006, plaintiff graduated from the Academy and was assigned to the
70th Precinct in Brooklyn.  (Def. 56.1 Stmt. ¶ 46; Pl. 56.1 Stmt. ¶ 41.)  There, his first-line
supervisors included Sergeant Edwin Boone.  (Def. 56.1 Stmt. ¶¶ 47–48; Pl. Dep. at 76–78.)
Plaintiff received three CDs while at the 70th Precinct, two for failure to appear in traffic court
and a third for a parking violation.  (Def. 56.1 Stmt. ¶¶ 56, 57, 61, 64; 2006 Command Discipline
Log, Switzer Dec'l Ex. M.)  Plaintiff testified that he verbally contested the CDs, but he did not
formally appeal any of them.  (Def. 56.1 Stmt. ¶¶ 58, 62, 64; P. Dec'l Ex. A, at 98–109.)
Plaintiff testified that he did not formally challenge any of them because he believed it could
result in his dismissal.  (Pl. 56.1 Stmt. ¶ 20; Pl. Dep. at 59.)

Plaintiff's 10-month performance evaluation and subsequent evaluations used a five-
point scale, with three meaning competent, lower than three meaning below standards, and above

three meaning above standards.  (Def. 56.1 Stmt. ¶ 66; Pl. 56.1 Stmt. ¶¶ 42–44.)  The evaluation

forms contain a page with a number of boxes for ratings on particular aspects of performance and

space on the second page for typed comments.  (*See, e.g.*, 10-month Leonard/Mascol Evaluation,

Switzer Dec'l Ex. O.)  Each performance evaluation lists a Rater and a Reviewer.  The Rater,

who is the direct supervisor of the officer being evaluated, fills out the performance evaluation

after conferring with anyone else who directly supervised the officer during the rating period

(Deposition of Inspector Donna Jones, Switzer Dec'l Ex. Y at 150–53.)  The evidence does not

reflect how the Reviewer is chosen, or what responsibilities a Reviewer has.  The Rater for

plaintiff's 10-month evaluation was Sergeant Colleen Leonard and the Reviewer was Lieutenant

Mascol.  (Def. 56.1 Stmt. ¶ 67; 10-month Leonard/Mascol Evaluation.)  Plaintiff's overall rating

was a three.  (Def. 56.1 Stmt. ¶ 66; Pl. 56.1 Stmt. ¶ 42.)  The written comments describe plaintiff

as "always produc[ing] good steady activity in every area of policing . . . meet[ing] all required

performance standards and in some areas surpass[ing expectations;] [and] present[ing] no

disciplinary problems."  (10-month Leonard/Mascol Evaluation, Switzer Dec'l Ex. O.)  "He is

courteous and compliant to supervisors and if he continues his progress he should make a fine

police officer and be an asset to the police department."  (*Id.*)

### b.  Alleged Discriminatory Treatment

Plaintiff describes comments made by Integrity Control Officer Lieutenant Cirrito, who

issued two of the three CDs plaintiff received while at the 70th Precinct.  (Def. 56.1 Stmt. ¶¶ 51–

62; Pl. Dep. at 87–100, 175.)  Plaintiff testified that on one occasion, Lieutenant Cirrito said,

referring to plaintiff, "they let anybody graduate the [A]cademy now."  (Def. 56.1 Stmt. ¶ 51; Pl.

Dep. at 87.)  Plaintiff testified that he understood this to be a reference to his dreadlocks.  (Def.

56.1 Stmt. ¶ 52; Pl. Dep. at 88.)  On another occasion, Lieutenant Cirrito asked how plaintiff

6

could afford the car he was driving, asking "you're not doing anything illegal, are you?"  (Def. 56.1 Stmt. ¶ 54; Pl. Dep. at 175.)  Plaintiff testified that when they were discussing one of the CDs, Cirrito suggested that plaintiff might have missed a court date because his hair was too heavy.  (Def. 56.1 Stmt. ¶ 60; Pl. Dep. at 89–90.)

In addition, plaintiff testified that some officers at the 70th Precinct, including Lieutenant Cirrito, called plaintiff "Stumpy" because of the appearance of his hair, though plaintiff's direct supervisors did not call him "Stumpy."  (Def. 56.1 Stmt. ¶ 50; Pl. Dep. at 87, 90–91.)  While at the 70th Precinct, plaintiff spoke to Sergeant Boone about offensive comments about his hair and Boone advised him to "tough it out."  (Def. 56.1 Stmt. ¶ 53; Pl. Dep. at 89.)

### 3.  The 71st Precinct

#### a.  Employment

In July 2006, plaintiff requested and was granted a transfer to the 71st Precinct because it was closer to his home.  (Def. 56.1 Stmt. ¶ 68; Pl. 56.1 Stmt. ¶ 46.)  Plaintiff testified that he was given a choice of where to be placed based on his performance at the Academy on quantitative measures including number of arrests and summonses.  (Pl. Dep. at 82–83.)  In or around January 2007, plaintiff was transferred to a squad where, again, he was directly supervised by Sergeant Edwin Boone.  (Def. 56.1 Stmt. ¶¶ 75–77; Pl. 56.1 Stmt. ¶ 55; Pl. Dep. at 117-18.)  Sergeant Boone retired in the summer of 2007, and Sergeant Lency Signal became plaintiff's direct supervisor.  (Def. 56.1 Stmt. ¶¶ 77–78; Pl. Dep. at 118.)  Lieutenant Ann Towpash was Sergeant Boone's supervisor.  (Deposition of Ann Towpash, Burden Dec'l Ex. M at 10.)  Captain Shouldis was the Executive Officer of the 71st Precinct until December 2006.  (Deposition of Daniel Shouldis, Burden Dec'l Ex. T at 5–6.)

The Rater for plaintiff's 16-month performance evaluation was Sergeant Boone and the Reviewer was Lieutenant Towpash.  (Def. 56.1 Stmt. ¶ 93; 16-month Boone/Towpash Evaluation, Switzer Dec'l Ex. R.)  Sergeant Boone gave plaintiff an overall rating of three-and-a-half to four, and a rating of four in many of the specific categories, but his ratings were changed by Lieutenant Towpash to a three.  (Def. 56.1 Stmt. ¶¶ 92, 101; Pl. 56.1 Stmt. ¶¶ 55, 61, 63; Deposition of Edwin Boone, Burden Dec'l Ex. N at 40–77.)  He received fours in "Community Interaction," "Adaptability," and "Physical Fitness/Physical Activities," and only a single two in "Interpersonal Skills."  (16-month Boone/Towpash Evaluation.)  The written comments state that plaintiff "respects authority and works well with the public, but has a poor rapport with his peers. He is highly competitive and refuses to appreciate the wisdom of senior officers. . . . [he] is an active police officer with many arrests. He often volunteers for difficult assignments . . . . [he] works hard to reduce crime. He is well groomed and his uniforms are always neat and clean. There are many communities within the precinct that relate to [him], and recognize him as a person that they can trust, based on the respectful manner in which he conducts himself."  (*Id.*) Sergeant Boone testified generally that he perceived plaintiff to be an above-average police officer.  (Boone Dep. at 17–21.)  He also testified that plaintiff performed above-average in objective measures, including number of arrests, relative to his peers.  (*Id.* at 20.)

The Rater for plaintiff's 22-month performance evaluation was Sergeant Signal and the reviewer was Captain Mark DiPaolo.  (Def. 56.1 Stmt. ¶ 103–04; 22-month Signal/DiPaolo Evaluation, Switzer Dec'l Ex. T.)  Plaintiff's overall rating was two-and-a-half.  (*Id.*)  The comments criticize plaintiff's "Community Interaction," "Judgment," and "Interpersonal Skills" and recommend that his probation and performance monitoring be extended.  The Rater comments include that plaintiff "shows little interaction on patrol when dealing with the

community and needs to be more involved."  It goes on to say: "[Plaintiff] is [] polite and

courteous with supervisory officers. At times [plaintiff] displays a lack of judgment when

performing his job function. [Plaintiff] needs to develop a better rapport with his peers and

supervisor."  (22-month Signal/DiPaolo Evaluation.)

      The review period for plaintiff's 22-month evaluation was the six-month period ended

May 10, 2007.  (*Id.*)  The record is unclear as to the exact date when Sergeant Boone retired.

However, plaintiff testified that Sergeant Signal was his sergeant for approximately 3 weeks to a

month prior to transferring to the 60th Precinct in June 2007.  (Pl. Dep. at 118.)  Therefore,

Sergeant Signal was plaintiff's supervisor for a very small part, if any part at all, of the six-

month time period relevant to the 22-month evaluation she supplied.[3]

      While at the 71st Precinct, plaintiff received two CDs, one for losing his identification

card and another for failing to properly maintain his memo book.  (Def. 56.1 Stmt. ¶¶ 84, 87;

Reports of Violation, Switzer Dec'l Exs. P, Q.)  Plaintiff verbally challenged both CDs, but did

not formally appeal them.  (Pl. Dep. at 133.)

      On June 11, 2007, Deputy Inspector Frank Vega, the Commanding Officer of the 71st

Precinct, sent a memorandum to the Chief of Personnel concurring with the 22-month evaluation

and listing plaintiff's two CDs as well as seven minor violations.[4]  (Def. 56.1 Stmt. ¶¶ 110–11;

Pl. 56.1 Stmt. ¶ 62; June 11, 2007 Memorandum of D. Insp. Vega, Switzer Dec'l Ex. U.)

---

[3] Plaintiff testified to statements of Sergeant Signal related to the 22-month evaluation.
However, such statements constitute hearsay, and they therefore are not considered by the Court
on this motion for summary judgment.  Fed. R. Civ. P. 56(c)(4).

[4] Plaintiff's minor violations included being unshaven, improper memo book entries, and failing
to sign out, among other things.  (Def. 56.1 Stmt. ¶¶ 110; June 11, 2007 Memorandum of D.
Insp. Vega, Switzer Dec'l Ex. U.)

**b. Alleged Discriminatory Treatment**

Plaintiff describes comments made by two of his superiors at the 71st Precinct, Lieutenant Towpash and Captain Shouldis.  Plaintiff testified that when Lieutenant Towpash first met him in or around July 2006, she said, "They actually let you graduate with those things in your hair?"  (Def. 56.1 Stmt. ¶ 69–70; Pl. 56.1 Stmt. ¶ 47.)  Plaintiff testified that at the time, he explained that he was a Rastafarian and that his hair was part of his culture.  (*Id.*)  Plaintiff testified that Lieutenant Towpash also asked, "What's next? Marijuana smoking in the precinct?"  (Def. 56.1 Stmt. ¶ 71; Pl. Dep. at 179–80.)  Plaintiff testified that on about six occasions, when they had prisoners with dreadlocks, Lieutenant Towpash said something to plaintiff like, "Go be with your people back there" or "Deal with your people back there. They're acting like animals."  (Def. 56.1 Stmt. ¶ 81; Pl. Dep. at 123, 127.)  Plaintiff testified that on about two occasions, he asked Lieutenant Towpash to stop making such statements.  (Pl. Dep. at 128.)  Plaintiff testified that on three occasions, after he frisked a prisoner with dreadlocks, Lieutenant Towpash instructed another officer to frisk the prisoner again, saying, "they might be related."  (Def. 56.1 Stmt. ¶ 82; Pl. Dep. at 129.)  Plaintiff also testified that, after Sergeant Boone retired, there was an incident where Lieutenant Towpash asked him to get coffee, and, after he refused, she made a comment in the nature of "I'll fix you" or "We'll attend to you."  (Pl. Dep. at 122.)

Plaintiff and Sergeant Boone both testified that when plaintiff first met Captain Shouldis in or around July 2006, Captain Shouldis made a comment suggesting plaintiff had become a cop because "driving a dollar van was not working out for him."  (Def. 56.1 Stmt. ¶ 117; Pl. Dep. at 161; Boone Dep. at 23.)

Plaintiff describes a number of incidents that occurred while he was at the 71st Precinct which he attributes to an Officer Kern, with whom he had a prior argument: someone put

ketchup all over plaintiff's locker, which plaintiff interpreted to symbolize blood (Def. 56.1 Stmt. ¶ 95; Pl. Dep. at 143–44); someone placed notes on plaintiff's car reading "how do you afford this car?" and rolled up paper in his locker with "smoke this" written on them (Def. 56.1 Stmt. ¶ 96; Pl. Dep. at 143–44); and someone put plaintiff's name on a poster showing a criminal with dreadlocks in the roll call room (Def. 56.1 Stmt. ¶96; Pl. Dep. at 143–44.)  Officer Steven Navarra, who also worked at the 71st, testified that he saw the poster and considered it the sort of joke police officers often played.  (Deposition of Steven Navarra, Burden Dec'l Ex. V at 14–18.)

### 4.  The 60th Precinct

On June 4, 2007, plaintiff was temporarily assigned to the 60th Precinct in Coney Island, where Captain Shouldis was the Executive Officer.  (Def. 56.1 Stmt. ¶ 112; Pl. Dep. at 157–59; Shouldis Dep. at 5–6.)  Plaintiff testified that Captain Shouldis assigned him to an undesirable patrol following an incident wherein Captain Shouldis told him to voucher a lighting device being used by a store owner.  Upon learning that the store owner had a permit, plaintiff communicated this to Captain Shouldis, and, in response, Captain Shouldis threw plaintiff's memo book on the ground and said "You're playing with fire."  (Def. 56.1 Stmt. ¶ 114–15; Pl. Dep. at 159–60.)

Plaintiff testified that, in or around late June 2007, he was called into an office to see four officers, including Captain Shouldis, and was told he was being "modified."  He testified that they took his gun and shield and reassigned him from patrol to answering phones.  (Pl. Dep. at 163–65.)  In or around July 2007, plaintiff was transferred to the Viper unit in Queens, where his duties involved watching footage from security cameras.  (Def. 56.1 Stmt. ¶ 119; Pl. Dep. at 163–65.)  While at the 60th Precinct, plaintiff received a CD for unauthorized parking.  (Def. 56.1 Stmt. ¶ 113; Pl. Dep. at 157–58.)

11

### 5.  Termination

On June 28, 2007, the NYPD's Employee Management Division Committee convened to review plaintiff's suitability to continue in his position and ultimately recommended he be terminated.  (Def. 56.1 Stmt. ¶ 121–22; Pl. 56.1 Stmt. ¶ 75; July 10, 2007 Memorandum of Asst. Comm'r Wechsler, Switzer Dec'l Ex. W.)  This recommendation was transmitted to and approved first by the Chief of Personnel, then the First Deputy Commissioner to the Police Commissioner, and finally the Police Commissioner.  (Def. 56.1 Stmt. ¶ 123; July 16, 2007 Memorandum and First and Second Endorsements, Switzer Dec'l Ex. X.)  On August 27, 2007, plaintiff was informed that he was terminated from his position as a probationary police officer with the NYPD.  (Def. 56.1 Stmt. ¶ 124; Pl. 56.1 Stmt. ¶ 77.)

### B.  Procedural History

On February 29, 2008, plaintiff filed a Charge of Discrimination with the EEOC ("EEOC Charge").  (EEOC Charge of Discrimination, Switzer Dec'l Ex. Z.)  He checked a box stating that he was discriminated against based on his religion, and wrote "I was targeted by white supervisors because of my dreadlock hair and my religious beliefs as a follower of the Rastafarian religion in violation of [T]itle VII."  (Def. 56.1 Stmt. ¶ 125; EEOC Charge of Discrimination.)  Around June 30, 2008, the EEOC issued a Right to Sue letter.  (Compl. ¶ 18.)  On September 30, 2008, plaintiff commenced the instant action.  (Compl (Doc. 1).)  Defendant filed its motion for summary judgment on April 8, 2011.  (Def. Mot. Summ. J. (Doc. 49).)

## II.
## PROPER PARTIES

As an agency of the City of New York, the New York City Police Department cannot be sued independently.  *See Lauro v. Charles*, 219 F.3d 202, 205 n.2 (2d Cir. 2000); *Bailey v. N.Y.C. Police Dep't*, 910 F. Supp. 116, 117 (E.D.N.Y. 1996); N.Y.C. Charter, Ch. 17, § 396.

Thus, defendants' motion for summary judgment with regard to all claims against NYPD is
GRANTED.  The Court will therefore assess plaintiff's claims only as against the City of New
York (henceforth "defendant").

## III.
## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, interrogatories,
admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute
and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue of material fact is genuine "if the evidence
is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-
movant "is to be believed," and the court must draw all "justifiable" or "reasonable" inferences
in favor of the non-moving party.  *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,
158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).  Nevertheless, once
the moving party has shown that there is no genuine issue as to any material fact and that it is
entitled to a judgment as a matter of law, "the nonmoving party must come forward with
'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in
original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v.
Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases).  In other words, the nonmovant must
offer "concrete evidence from which a reasonable juror could return a verdict in [her] favor."
*Anderson*, 477 U.S. at 256.  Where "the nonmoving party bears the burden of proof at trial,
summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish

13

the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original).  Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48).

In discrimination cases, the merits typically turn upon an employer's intent, necessitating the exercise of abundant caution in granting summary judgment for the employer.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  Naturally, where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir.1994)).  "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.*

## IV.
## DISCUSSION

### A.  Title VII Employment Discrimination

#### 1.  Failure to Exhaust Administrative Remedies

Defendant argues that plaintiff's race discrimination claims should be dismissed because they were not raised in his EEOC Charge and therefore are barred for failure to exhaust administrative remedies.  "As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).  Plaintiff never explicitly raised racial discrimination claims to the EEOC.

14

A district court, however, may hear claims not in the original EEOC Charge if they are "reasonably related" to claims raised therein. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001). Claims will be reasonably related if "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (citation omitted). In deciding whether claims are reasonably expected to grow out of the original charge, the focus is on the factual allegations made in the original charge. *Id*. The central question is whether the administrative complaint gave the agency "adequate notice to investigate discrimination on both bases." *Id*.

In his EEOC Charge, plaintiff checked a box stating that he was discriminated against based on his religion, and wrote "I was targeted by white supervisors because of my dreadlock hair and my religious beliefs as a follower of the Rastafarian religion in violation of [T]itle VII." Plaintiff alleges in the instant action that the same comments and actions that constitute evidence of discrimination based on religion also serve as evidence of discrimination based on race and ethnicity. Because all three claims arise from the same conduct, that conduct would necessarily fall within the scope of the investigation of plaintiff's EEOC Charge. *See Gaston v. N.Y.C. Dep't of Health Office of Chief Med. Examiner*, 432 F. Supp. 2d 321, 329 (S.D.N.Y. 2006). In addition, the EEOC Charge specifically mentions "white supervisors," suggesting a racial component to the alleged discrimination. These factors are sufficient to establish that the EEOC was put on notice of potential racial discrimination. Here, the facts sufficiently "apprise the EEOC that another type of discrimination claim lurks in the background." *Alonzo v. Chase Manhattan Bank*, 25 F. Supp. 2d 455, 458 (S.D.N.Y. 1998). Therefore, plaintiff's allegation of

15

racial discrimination is "reasonably related" to his ethnicity and religious discrimination claims
in his EEOC Charge and is not barred by failure to exhaust administrative remedies.

### 2. Title VII Employment Discrimination[5]

Plaintiff alleges that defendant discriminated against him by terminating him on the basis
of race, religion, and ethnicity. Title VII provides that it is an "unlawful employment practice
for an employer . . . to discharge any individual, or otherwise to discriminate against any
individual with respect to his compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–
2(a)(1); *see Holcomb*, 521 F.3d at 137. Thus, "[a]n employment decision . . . violates Title VII
when it is based in whole or in part on discrimination." *Holcomb*, 521 F.3d at 137 (citation
omitted).

Courts analyze employment discrimination claims brought under Title VII in accordance
with the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S.
792, 802–03 (1973). First, a plaintiff must establish a *prima facie* case of discrimination by
demonstrating that: "(1) he is a member of a protected class; (2) he was qualified for the position
he held; (3) he suffered an adverse employment action; and (4) the adverse action took place
under circumstances giving rise to the inference of discrimination." *Ruiz v. Cnty. of Rockland*,
609 F.3d 486, 492 (2d Cir. 2010). The plaintiff's burden to support his *prima facie* case of

---

[5] Discrimination claims brought under the NYSHRL and NYCHRL proceed under the same
analytical framework applicable to Title VII claims. *See Salamon v. Our Lady of Victory Hosp.*,
514 F.3d 217, 226 n.9 (2d Cir. 2008). NYSHRL and NYCHRL are in some ways broader than
Title VII, but since summary judgment against plaintiff's claim is denied under the more
restrictive Title VII standard it is unnecessary to independently review the claim under NYSHRL
and NYCHRL standards. *See Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 66–67, 872
N.Y.S.2d 27 (N.Y. App. Div. 2009).

discrimination is "*de minimis*." *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) (citation omitted).

If the plaintiff succeeds in satisfying his initial burden, then "a presumption of discrimination arises, and the burden shifts to the defendant, who must proffer some legitimate nondiscriminatory reason for the adverse action." *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010).  If the defendant can offer such a reason, defendant "will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *Id.* (citation and ellipses omitted).  The plaintiff may show, for example, that the defendant's apparently legitimate reasons were pretextual, or that the defendant's proffered reason was not the sole reason and unlawful discrimination was at least a "motivating factor[ ]." *Holcomb*, 521 F.3d at 138 (citation omitted).  Plaintiff at all times bears the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (citation omitted).

Defendant argues that summary judgment is appropriate because plaintiff has failed to meet the second and fourth prongs of a *prima facie* case.  Alternatively, defendant argues that summary judgment is appropriate because defendant has set forth legitimate, non-discriminatory reasons for terminating plaintiff, and plaintiff cannot show that these reasons are pretextual.

### a.  Qualified for the Position

Defendant argues that plaintiff has not met the second prong of a *prima facie* case because he has not demonstrated that he was "satisfactorily performing the duties of his position."  However, the second prong only requires plaintiff to demonstrate that he was "qualified for the position he held," with a focus on his "competence and whether he 'possesses

17

the basic skills necessary for performance of [the] job.'" *Ruiz*, 609 F.3d at 492 (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)).  While performance may in some cases be so poor as to render a plaintiff unqualified, "the qualification prong must not be interpreted in such a way as to shift into the plaintiff's prima facie case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 & n.7 (2d Cir. 2001) (citation omitted); *see Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("[A]ll that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer."). Having already hired the employee in question, an "employer itself has already expressed a belief that [he] is minimally qualified." *Gregory*, 243 F.3d at 696; *see also Slattery*, 248 F.3d at 92.

Taking the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences therefrom, a reasonable jury may find sufficient evidence to conclude that plaintiff was so qualified.  This evidence includes plaintiff's employment history as a Marine.  (Pl. Dep. at 11.)  It also includes the generally satisfactory performance evaluations plaintiff received at NYPD prior to working under Lieutenant Towpash and Captain Shouldis, whom plaintiff is accusing of discrimination.  *See Ruiz*, 609 F.3d at 493; *Owens*, 934 F.2d at 409 (assigning relevance to evaluations from individuals other than supervisors accused of discrimination).

### b.  Adverse Employment Action

An adverse employment action is defined as a "materially adverse change in the terms and conditions of employment.  *See Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (internal quotations omitted).  It requires "a change in working conditions . . . more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal

18

quotations omitted).  "Examples of such a change include termination of employment, a

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of

benefits, [or] significantly diminished material responsibilities. . . ."  *Id.* (internal quotations

omitted).  Defendant does not dispute that plaintiff's termination constitutes an adverse

employment action.[6]   Moreover, the record establishes that plaintiff was reassigned to an

undesirable location at the 60th Precinct; was stripped of his gun and shield, placed on modified

duty, and moved from patrol to answering phones; and was then subsequently transferred to the

Viper unit in Queens to review security camera footage.  These changes in his conditions of

employment rise to the level of adverse employment actions.  *See, e.g.*, *Henderson v. City of New*

*York*, No. 05-CV-2588, 2011 U.S. Dist. LEXIS 78451, *14–15 n.4 (E.D.N.Y. July 20, 2011)

(finding at least that placement on modified duty was adverse employment action).

### c.  Inference of Discrimination

To meet the fourth prong of a *prima facie* case plaintiff must demonstrate that the

circumstances of his reassignment or termination give rise to an inference of discrimination.

"[A]n inference of discriminatory intent may be derived from . . . the employer's criticism of the

plaintiff's performance in ethnically degrading terms; or its invidious comments about others in

---

[6] Plaintiff's disciplinary notices and increased scrutiny do not constitute adverse employment actions separate from the negative results of termination and reassignment, as they did not in themselves effect a change in the terms and conditions of employment.  *See, e.g.*, *Henriquez v. Times Herald Record*, No. 97 Civ. 6176, 1997 U.S. Dist. LEXIS 18760, at *16–17 (S.D.N.Y. Nov. 25, 1997), *aff'd*, 165 F.3d 14 (2d Cir. 1998).  Furthermore, to the extent plaintiff alleges that he was disciplined more frequently or more harshly than others due to discrimination, a disparate impact claim, he has failed to identify any similarly situated employees who were not subjected to the same disciplinary treatment.  *See Lumhoo v. The Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 150 (E.D.N.Y. 2002).

the employee's protected group . . . or the sequence of events leading to the plaintiff's discharge." *Leibowitz*, 584 F.3d at 502 (citation omitted).[7]

In support of this aspect of his claim, plaintiff relies on evidence of the following.  In July or August 2005, Detective Comiskey instructed plaintiff to cut his hair, and plaintiff explained that he would not because it was part of his religion.  Plaintiff was soon thereafter demoted from Company Sergeant.  In September 2005, Lieutenant Cruz wrote a memorandum indicating that plaintiff was expected to require entry-level monitoring due to "bullying."  Plaintiff was then sent for psychological evaluation.  The conclusions of the psychologist were that plaintiff had no psychological problems and there was no evidence he was a bully.  After leaving the Academy, plaintiff received a positive 10-month performance review.  He was then transferred to the 71st Precinct, where he worked under Lieutenant Towpash and Sergeant Shouldis, both of whom allegedly made a series of comments exhibiting discriminatory animus.  (Pl. Dep. at 123–129, 179–180.)  Plaintiff's supervisor at the 71st precinct, Sergeant Boone, gave him a very positive 16-month performance evaluation, which Lieutenant Towpash then altered to be only modestly above-average.  Sergeant Boone also testified that plaintiff performed above-average, both generally and in objective measures, including number of arrests, relative to his peers.  Plaintiff's 22-month performance evaluation, which was below-average, was completed shortly after Sergeant Boone's retirement, and was completed by a reviewer with whom plaintiff had worked for only a very short time.  Plaintiff was then given an undesirable assignment by Captain Shouldis, and, following an additional incident with Captain Shouldis, plaintiff was put

---

[7] Contrary to defendant's argument, a showing of similarly situated individuals who were treated more favorably than plaintiff is required only in the context of a disparate impact claim—merely *one way* of showing an inference of discrimination.  *See Abdu-Brisson v. Delta Air lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).

on modified duty, his gun and bade taken away, and then again reassigned to an even less desirable assignment that did not involve patrol duties—watching security camera footage.

The non-neutral nature of Lietenant Towpash's alleged remarks in particular is belied by the context of several of the comments. The comments linked plaintiff's dreadlocks to another characteristic associated with Rastafarianism—marijuana use—and she conceded in her deposition that she was aware of Rastafarianism, and she associated it with dreadlocks. (Towpash Dep. at 34.) Other of her comments link plaintiff's appearance to her perception of the appearance of criminals, arguably with reference to his race and religious hairstyle. Captain Shouldis's remarks also have a racial or ethnic component—likening plaintiff to a "dollar van driver"— is arguably based on his race, religious hairstyle, and/or presumed ethnicity. These statements could be understood by a reasonable factfinder as reflecting discriminatory animus based on race, religion, and ethnicity.[8]  *See Millin v. McClier Corp.*, 02-CV-6592, 2005 U.S. Dist. LEXIS 2024, at *17–18 (S.D.N.Y. Feb. 14, 2005) (holding that comments about the plaintiff's dreadlocks could be construed as evidence of discrimination based on race, religion, or national origin).

While stray remarks are insufficient to make out discrimination, when "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998).   Here, it was Towpash and Shouldis themselves who linked

---

[8] The Court need not disaggregate statements relating to plaintiff's race, religion, and his national origin.  Because "race, religion, and national origin are commonly associated with one another, it is difficult, and unnecessary, to consider whether the various allegedly discriminatory incidents . . . clearly point to either race-, religion-, or national-origin-based discrimination. The line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of . . . origin, is not a bright one." *See Millin v. McClier Corp.*, 02-CV-6592, 2005 U.S. Dist. LEXIS 2024, at *17 (S.D.N.Y. Feb. 14, 2005) (quoting *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 614 (1987)) (internal quotations omitted).

plaintiff's dreadlocks to his performance—e.g., saying he became a cop because another stereotypical job did not "work out" and denigrating his handling of suspects when the suspects wore dreadlocks ("your people" and "they might be related").  Furthermore, the timing of the remarks and the subsequent alteration of plaintiff's 16-month evaluation and reassignment, culminating in his termination, taken together, allow an inference of discriminatory motive to satisfy the fourth prong of plaintiff's prima facie case.  *See id*; *Gregory*, 243 F.3d at 697.

### d.  Non-Discriminatory Purpose and Evidence of Pretext

Defendant argues that there were legitimate, non-discriminatory reasons for plaintiff's termination and that plaintiff has not demonstrated any evidence that those reasons were pretextual, or that discrimination was a motivating factor in his termination.  Defendant relies on the fact that the decision to terminate plaintiff was made by the Police Commissioner and recommended by the Committee based on the contents of his personnel file.  According to defendant, the contents of plaintiff's file support the reason for his termination—poor job performance, as revealed by low ratings on his evaluations, particularly the 22-month evaluation, and the number of Command Disciplines he received.  Indeed, plaintiff has not offered any evidence suggesting that any of the Committee members or the Police Commissioner harbored any discriminatory animus.  Without assessing the strength or credibility of this evidence, the Court finds that it satisfies defendant's burden of production as to a non-discriminatory purpose for plaintiff's termination.  *See Holcomb*, 521 F.3d at 141.

However, there is sufficient evidence in the record to raise questions of fact as to whether these proffered reasons were pretext for discrimination.  To be sure, plaintiff had performance issues.  But given the evidence of the alleged remarks of Lieutenant Towpash, Captain Shouldis, and others, this Court cannot conclude *as a matter of law* that the adverse employment actions

2e8bb881cdfc5f9e

taken against plaintiff were not motivated by discriminatory animus.  Questions of fact remain:
for example, were the alleged discriminatory remarks made, and if so, are they sufficient to
establish unlawful discrimination?   While plaintiff does not allege that either the committee
members or the Commissioner were motivated by discriminatory intent, he has pointed to
evidence sufficient to allow a reasonable jury to determine that the recommendation and the
decision adopting it were based on a record influenced by discriminatory animus.  *See Karim v.
Dep't of Educ. of N.Y.C.*, 08-CV-2235, 2010 U.S. Dist. LEXIS 141756, at *24–25 (E.D.N.Y.
Mar. 2, 2011) (where termination decision was not made by a direct supervisor but based on a
record at least partially created by that supervisor, evidence of discriminatory motivation for the
creation of that record can establish that the decision was unlawful); *cf. Back v. Hastings on
Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125 (2d Cir. 2004) (finding that biased
performance reviews that contributed to a decision to terminate had sufficiently connected the
bias to the termination to show employment discrimination in the context of a Section 1983
claim).

        Moreover, plaintiff asserts that the scores he received on his 16-month and 22-month
performance evaluations weres affected by Lieutenant Towpash, and that Lieutenant Towpash
had no non-discriminatory motivation for altering those scores.  Plaintiff relies on evidence that
Lieutenant Towpash changed the scores on his 16-month performance evaluation from mostly
above-average scores to average and below-average scores, and added or directed Sergeant
Boone to add negative comments.  Defendant has not pointed to any evidence that these changes
were based on any non-discriminatory motivation.  Plaintiff also asserts that Lieutenant Towpash
affected his 22-month performance evaluation, which was performed by a supervisor with whom
he had worked for only a small part of the evaluation period.  In fact, the record indicates that

Sergeant Boone was plaintiff's supervisor for most of the evaluation period, and he testified that he believed plaintiff's performance to be above-average.

Even if Lietenant Towpash did not affect the 22-month evaluation, a reasonable factfinder could believe that an above-average score on his 16-month performance evaluation could have affected the plaintiff's overall perceived performance level, and perhaps more importantly, its trajectory. Without doubt, Plaintiffs accumulation of CDs and other infractions raise troubling issues for a probationary police officer, and the court in no way minimizes their significance; but none directly relate to the performance of plaintiff's patrol duties, and two were based on the accumulation of Deportment Cards.   And prior to the change of the16-month evaluation, plaintiff's performance reviews were improving—his evaluation at the end of Academy said he was "conforming" his behavior; his 10-month evaluation said he was meeting standards and often exceeding expectations; and Sergeant Boone testified he gave plaintiff an above-average review in his 16-month evaluation, with ratings far above average in several areas, prior to Lieutenant Towpash's changes. The below-average 22-month review, supplied by a Sergeant who had only supervised plaintiff for a fraction of the review period, cuts against this trend. The comments in that review neither suggest any marked difference from past reviews, nor do they explain if or how plaintiff's previous CD's and other infractions were now of such import as to warrant the unsatisfactory review. To the extent defendant attempts to explain plaintiff's modified duty and reassignment on plaintiff's CD's and other issues, those arguments fail for the same reasons as when applied to termination. That is to say, while performance and disciplinary problems may be legitimate reasons for modified duty, reassignment, and ultimately termination, the content and trajectory of plaintiff's reviews, the conduct of his supervisors and coworkers, and the timing of the relevant facts call defendant's proffered reasons into question.

Accepting all of plaintiff's allegations as true and drawing all reasonable inferences in his favor, as is required at this stage of the process, plaintiff has raised a genuine issue of material fact as to whether a jury could reasonably determine that the proffered reasons for plaintiff's adverse employment actions were pretext, and that those decisions were instead motivated by discriminatory animus.  Such questions of fact preclude a grant of summary judgment.  Thus, defendant's motion with regard to plaintiff's Title VII employment discrimination claim, New York State Human Rights Law employment discrimination claim, and New York City Human Rights Law employment discrimination claim is DENIED.

## B. Title VII Hostile Work Environment

### 1. Time-Barred Claims

As a threshold matter, a plaintiff may not bring a Title VII claim concerning events which occurred more than 300 days prior to the filing of a Title VII charge with an agency authorized to hear such actions. 42 U.S.C. § 2000e-5(e).  Plaintiff filed administrative charges of discrimination on February 29, 2008.  Defendant contends that the incidents that plaintiff alleges occurred prior to May 5, 2007 are time-barred. This Court does not agree. "[I]f incidents are a part of an alleged hostile work environment, the limitations period requirement is met if one of the incidents meeting the requirements of such an environment occurs within the period." *Milne v. Navigant Consulting*, 08-CV-8964, 2009 U.S. Dist. LEXIS 112632, at *11 (S.D.N.Y. Nov. 30, 2009) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116–17 (2002)).  In this case, plaintiff claims he was subjected to a hostile work environment based on his entire tenure with the NYPD, which he alleges was permeated with incidents of discrimination.  Accordingly, the Court will evaluate conduct occurring more than 300 days prior to the filing of his administrative charge to the extent it relates to plaintiff's hostile work environment claim.

## 2.   Title VII Hostile Work Environment[9]

To make out a hostile work environment claim, a plaintiff must establish that: (1) that his workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997).  The conduct in question "must be severe and pervasive enough to create an environment that would reasonably be perceived, and is perceived, as hostile or abusive."  *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)) (internal quotation marks omitted).

A plaintiff generally "must prove more than a few isolated incidents of [discriminatory] enmity.  Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute."  *Snell v. Suffolk Cnty.*, 782 F.2d 1094, 1103 (2d Cir.1986) (citations omitted).  However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations omitted).  The court must consider "all the circumstances," such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (citing *Harris*, 510 U.S. at 23).  While other claims focus on discrete harms, a hostile work

---

[9] Hostile work environment claims brought under the NYSHRL and NYCHRL, again, proceed under the same analytical framework applicable to Title VII claims. *See Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008).  NYSHRL and NYCHRL are in some ways broader than Title VII, but since summary judgment is denied under the more restrictive Title VII standard it is unnecessary to independently review the claim under NYSHRL and NYCHRL standards.  *See Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 66–67 (N.Y. App. Div. 2009).

environment claim requires analysis of the "workplace environment as a whole." *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001).

In support of his claim, plaintiff points to evidence of the following.  (1) Detective Comiskey suggested plaintiff cut his hair despite his explanation of its religious significance, and plaintiff was shortly thereafter removed from the Company Sergeant position.  Lieutenant Cirrito later made three comments, including: (2) "they let anybody graduate the academy now;" (3) a question as to how plaintiff could afford the car he was driving, saying "you're not doing anything illegal, are you?" and; (4) a joke that plaintiff might have missed a court date because his hair was too heavy.  Lieutenant Towpash later made at least ten remarks, including: (5) "They actually let you graduate with those things in your hair?" and "What's next? Marijuana smoking in the precinct?"; (6-11) six occasions involving comments related to handling prisoners with dreadlocks such as "Deal with your people back there. They're acting like animals;" (12-14) three occasions where she instructed another officer to frisk a prisoner with dreadlocks, despite the prisoner having already been frisked by plaintiff, because "they might be related;" and (15) the comment "I'll fix you."  Captain Shouldis (16) made a joke that plaintiff became a police officer because "driving a dollar van was not working out for him," and (17) following a disagreement, he told plaintiff he was "playing with fire."

Plaintiff also raises two sets of repeated remarks, as well as a number of potentially relevant incidents.  At the Academy, other officers and employees repeatedly suggested that plaintiff cut his hair.  Also, at the 70th Precinct, plaintiff was repeatedly referred to by the nickname "Stumpy" despite his requests that he not be referred to that way.  There were also three incidents that plaintiff attributes to Officer Kern involving (1) ketchup on plaintiff's locker, which plaintiff interpreted to represent blood, (2) notes asking how plaintiff affords his car with

27

rolled up paper in his locker saying "smoke this," and (3) the addition of plaintiff's name to a poster showing a criminal with dreadlocks that was displayed prominently in the roll call room. Plaintiff also raises four supervisory actions including (1) Lieutenant Towpash's alteration of his 16-month evaluation, and Captain Shouldis's (2) giving plaintiff an undesirable patrol, (3) stripping plaintiff of his gun and shield and putting him on "modified" duty, answering phones, and (4) reassignment to the Viper unit to watch security cameras.

Plaintiff also alleges that the disciplinary notations he has received are part of the body of conduct producing a hostile work environment. While neutral conduct may be used to support a course of discrimination, and a jury may infer that conduct in the nature of harassment was based on discriminatory animus, s*ee, e.g.*, *Howley*, 217 F.3d at 156; *Raniola*, 243 F.3d at 622, plaintiff has not offered evidence to link this behavior to discrimination. Therefore, the Court will not consider his disciplinary notations as conduct contributing to a hostile work environment. Neither does the Court consider the comment alleged by an unknown instructor saying he would "have problems" if he didn't cut his hair, as it is alleged with insufficient specificity.

However, even setting aside those allegations, plaintiff has raised at least 17 discrete comments, two sets of general comments, three harassing incidents, and at least four significant supervisory decisions related to his employment alleged to be characterized by discriminatory animus, over the course of approximately two years. In particular, plaintiff relies on evidence regarding a number of statements made by Detective Comiskey, Lieutenant Towpash, and Captain Shouldis while he was under their supervision. As discussed above, these statements could be understood as reflecting racial, religious, or ethnic animus. *Millin*, 2005 U.S. Dist. LEXIS 2024, at *17–18. Prior derogatory comments may permit an inference that further treatment was motivated by a discriminatory bias. *Raniola*, 243 F.3d at 622. These were not

isolated comments, as demonstrated by the repeated nature of some comments and, in particular, the number of comments made by Lieutenant Towpash during plaintiff's time at the 71st Precinct.  Some of the statements and conduct were related directly to his job performance; some were humiliating with respect to their content or public nature; and some could be perceived as threats.  While each individual comment may not be exceptionally severe, it could reasonably be inferred, again, particularly based on Lieutenant Towpash's comments, that plaintiff was likened to a criminal and that the perception of his performance was colored based on his race, religious practice, and perceived ethnicity.  This marks an alteration of the conditions of his work environment, especially given the sensitive nature of plaintiff's work as a police officer, a job requiring trust within a unit in order to ensure safety.  *See, e.g.*, *Howley*, 217 F.3d at 154.

Plaintiff has described conduct by both coworkers and supervisors.  The actionable conduct of a supervisor may be imputed to defendant as a matter of law.  *Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 188 (S.D.N.Y. 2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) (''An employer is subject to vicarious liability . . . [for an] environment created by a supervisor with immediate (or successively higher) authority . . . .'')).  The actions of plaintiff's coworkers in creating a hostile work environment can be imputed to his employer where the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  *Murray v. N.Y. Univ. Coll. Of Dentistry*, 57 F.3d 243, 249 (2d Cir. 1995) (internal quotations omitted).  Knowledge may also be imputed to an employer "where the employer (or its agents or supervisory employees) knew *or should have known* of the conduct."  *Id.* (internal quotations omitted).  Defendants challenge to the hostile work environment focuses on the nature and severity of the conduct alleged, and neither side has identified record evidence of a reasonable avenue for complaints.  Also, plaintiff testified that

while at the 70th Precinct, he complained to Sergeant Boone about the allegedly discriminatory conduct of his coworkers and Boone advised him to "tough it out" and took no action to stop the conduct.  Plaintiff also testified that he complained to a union representative about the ketchup smeared on his locker, and no action was taken.  Plaintiff also asserts that he asked Lieutenant Towpash, a supervisor, to discontinue her comments.  Taking plaintiff's evidence as true and drawing all reasonable inferences in his favor, a jury could find that defendant both failed to provide an effective avenue for plaintiff's complaints and knew, through its supervisory employees, about the harassment and did nothing about it.  Therefore, the conduct of plaintiff's coworkers can be imputed to defendant.

Considering the totality of circumstances, *Howley*, 217 F.3d at 154, a reasonable jury could find sufficient evidence to support a hostile work environment claim.  Defendant's motion with regard to plaintiff's hostile work environment claim pursuant to Title VII, New York State Human Rights Law, and New York City Human Rights Law is DENIED.

**C.  Section 1981 Discrimination**

Section 1981 of Title 42 of the United States Code provides that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).  "This section outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment . . . ."  *Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004); *see, e.g.*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68–69 (2d Cir. 2000).  To establish a Section 1981 claim, plaintiff must show: "(1) that [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that

30

the discrimination concerned one or more of the activities enumerated in Section 1981."[10]

*Lautere v. Int'l Bus. Mach. Corp.*, 216 F.3d 258, 261 (2d Cir. 2000).

However, Section 1981 does not and cannot, within constitutional bounds, impose vicarious liability on municipalities; as such, Section 1981 liability against such entities can be asserted only pursuant to 42 U.S.C. § 1983 ("Section 1983"), and even then only in accordance with the well-established requirements promulgated in *Monell v. N.Y.C. Dep't of Soc. Services*, 436 U.S. 658, 694 (1978). *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989); *McCoy v. City of New York*, 131 F. Supp. 2d 363, 377–78 (E.D.N.Y. 2001) (citing *Philippeaux v. N. Cent. Bronx Hosp.*, 871 F. Supp. 640, 653–56 (S.D.N.Y. 1994) ("[T]o assert a Section 1981 claim against municipal entities . . . plaintiff must allege a violation of Section 1983 and meet the requirements of *Monell*.")). Plaintiff's Complaint seeks to impose liability on a municipality, and it asserts the elements of a Section 1981 claim, but it fails to assert an express cause of action under Section 1983. That failure alone warrants dismissal of his Section 1981 claim. *McCoy*, 131 F. Supp. 2d at 378–79. However, even if municipal liability for Section 1981 were not dependent upon the express assertion of a Section 1983 cause of action, plaintiff still must show that the conduct complained of was pursuant to an official municipal policy or practice or undertaken by a municipal employee with final policymaking authority. *Patterson*, 375 F.3d at 226; *see, e.g.*, *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 373 (S.D.N.Y. 1999).

---

[10] Section 1981 prohibits employment discrimination only on the basis of race, and does not apply to national origin or religious discrimination. *See, e.g.*, *St. Francis College v. Al-Khazraji*, 481 U.S. 604, 613; *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998). A reasonable jury could find that plaintiff's evidence demonstrates the existence of discrimination based on racial, religious, or ethnic animus. *Millin*, 2005 U.S. Dist. LEXIS 2024, at *17–18. Therefore, taking plaintiff's evidence as true and making reasonable inferences in his favor, this Court treats his Section 1981 claim as one based on racial discrimination.

31

Under *Monell*, an actionable municipal policy exists where "(1) the [c]ity has promulgated a formal rule advocating or supporting the contested conduct, or (2) a single act is taken by a municipal employee who, as a matter of state law, has final policymaking authority in the area in which the action was taken." *Edwards v. City of New York*, 03-CV-9407, 2005 U.S. Dist. LEXIS 34376, at *31–32 (S.D.N.Y. Dec. 19, 2005) (internal quotations omitted). An actionable custom exists where the applicable practice is "so widespread as to have the force of law." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). The practice must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Patterson*, 375 F.3d at 226 (quoting *Sorlucco v. N.Y.C. Police Department*, 971 F.2d 864, 871 (2d Cir. 1992)). Such a custom need not have formal approval, but its existence must be permanent. *See Davis v. City of New York*, 228 F. Supp. 2d 327, 337 (S.D.N.Y. 2002) (citation omitted).

As an initial matter, nowhere in plaintiff's Complaint does he allege that defendant maintained a custom, policy or practice of discriminating against individuals on the basis of race, and nowhere does he describe defendant's actions in terms sufficient to maintain a *Monell* claim—a fact which itself permits summary dismissal. *See Birmingham*, 70 F. Supp. at 373. In his opposition to summary judgment, plaintiff argues that the statements of Sergeant Boone and Officer Navarra, who worked with plaintiff at the 71st Precinct, offer evidence of a custom of discrimination. Sergeant Boone testified that he overheard conversations of other officers, that they were "surprised" by plaintiff's hairstyle, that he was perceived as a perpetrator because of his appearance, and that there was "a lot of guessing about who [plaintiff] is" based on his unusual hairstyle and its religious significance. (Boone Dep. at 20–30.) Officer Navarra testified that the incident involving plaintiff's name being written below a photograph of a criminal was "a joke" and that officers "do these things to each other all the time, in a joking

32

manner." (Navarra Dep. at 18.) Officer Navarra's testimony does not support a custom of

discrimination exists. Sergeant Boone's testimony regarding the statements of unnamed officers,

while consistent with a theory of discriminatory motive as to plaintiff's treatment, offers nothing

to support that racially discriminatory conduct is being directed against blacks generally.

Sergeant Boone's testimony does not mention any conduct, and instead only mentions statements

that suggest a general sentiment at most. Furthermore, no evidence of any kind has been offered

to show conduct directed toward anyone other than plaintiff. Plaintiff has failed to produce any

evidence of specific facts that would permit a reasonable jury to conclude that such behavior is

"so 'persistent or widespread' as to constitute 'a custom or usage with the force of law" and "so

manifest as to imply the constructive acquiescence of senior policy-making officials." *Patterson*,

375 F.3d at 226 (quoting *Sorlucco v. N.Y.C. Police Department*, 971 F.2d 864 (2d Cir. 1992)).

Neither has plaintiff produced evidence to permit a reasonable jury to conclude that his

termination was pursuant to a municipal policy, practice or custom. While an individual act of a

single policymaker can result in *Monell* liability in some circumstances, *see Pembaur v. City of

Cincinnati*, 475 U.S. 469, 480 (1986), that is not the case here. The Police Commissioner

exercised final decision-making authority regarding plaintiff's employment. *Monell* liability can

only result from a decision-maker's approval of a recommendation influenced by discriminatory

animus when the decision-maker either approved the recommendation based on a discriminatory

motive, had actual knowledge that the recommendation was influenced by discriminatory

animus, or approved the recommendation with "reckless disregard for or deliberate indifference

to" the existence of discriminatory animus. *Davis*, 228 F. Supp. at 341–42 (citing *Praprotnik*,

485 U.S. at 129–30). Plaintiff does not contend, nor does the record demonstrate, that the Police

Commissioner was acting with discriminatory animus, nor that the Police Commissioner had

33

actual knowledge or any reason to believe that the recommendation was influenced by discriminatory animus. Therefore, plaintiff has failed to adduce sufficient evidence to support municipal liability under *Monell*. *See Birmingham*, 70 F. Supp. 2d at 373.

This is not inconsistent with the Court's holding above that plaintiff has offered evidence sufficient to meet his burden in the context of Title VII to show discriminatory adverse employment actions and a hostile work environment. Plaintiff has not offered evidence that the conduct alleged in support of his Title VII claims was pursuant to custom or usage with the force of law. Nor is he able to impute such conduct to the municipality in the context of his Section 1981 claim, as he is able to do for the conduct of supervisors in support of his Title VII claims. *See, e.g.*, *Back*, 365 F.3d at 125 (finding that plaintiff offered sufficient evidence of employment discrimination on the part of individuals completing performance reviews, but no custom or policy enabling a claim against employer under Section 1983); *Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 514 (S.D.N.Y. 2010) (finding that plaintiff offered sufficient evidence of hostile work environment, but those facts did not allege a custom or policy to support liability against the municipality under Section 1983).

In light of the foregoing, the Court GRANTS summary judgment in favor of defendant with respect to plaintiff's Section 1981 claim.

**D. Intentional Infliction of Emotional Distress**

Plaintiff alleges that defendant engaged in extreme and outrageous conduct, intentionally or recklessly causing severe emotional distress to plaintiff. As a matter of New York state common law, "[p]ublic policy bars claims for intentional infliction of emotional distress against a governmental entity." *See, e.g.*, *Ellison v. City of New Rochelle*, 62 A.D.3d 830, 833 (N.Y. App. Div. 2009) (quoting *Liranzo v. N.Y.C. Health & Hosps. Corp.*, 300 A.D.2d 548 (N.Y. App.

Div. 2002).  Both New York City and NYPD are governmental entities.  Therefore, defendant's motion with regard to plaintiff's intentional infliction of emotional distress claim is GRANTED.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to all claims against NYPD and as to plaintiff's Section 1981 and intentional infliction of emotional distress claims against the City of New York, and is DENIED as to plaintiff's Title VII, New York State Human Rights Law, and New York City Human Rights Law employment discrimination and hostile work environment claims against the City of New York.

This matter is re-committed to the assigned Magistrate Judge for all remaining pre-trial matters.

SO ORDERED.

Dated: Brooklyn, New York
March 28, 2012

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge